Good afternoon, Counsel. Good afternoon, Your Honor. Please proceed. May it please the Court. My name is Christina Shindley. I represent the Idaho Department of Correction. I would like to reserve five minutes for rebuttal. Counsel, please be reminded that the time shown on the clock is your total time remaining. Thank you, Your Honor. IDOC articulated a real and present risk to confidential execution information in its discovery responses and responses to the motions to compel below. At this time, IDOC seeks an order vindicating its clear right to protect that vulnerable information. Plaintiffs seeks information that will compromise IDOC's ability to carry out a lawfully ordered judgment of execution. How, Counsel? Your Honor, the harm that is posed by the ordered disclosures is that IDOC's execution chemical source and supplier will be disclosed. And IDOC submits that that will occur because there is a kaleidoscope of information already available to plaintiff. You made that argument to the district court, right? Yes, Your Honor. And you're not really challenging on appeal the district court's standard. You said even under the district court standard, the district court got it wrong, correct? Yes, Your Honor. So, and basically what the court had to do, correct me if I'm wrong, is take the answers that you object to collectively and look at the impact that that would have or not have on the disclosure of the information which you want to keep secret, right? Yes, Your Honor. So where is it? Because I'm having trouble finding it. If we take all of that, and I know we'll get into some jurisdiction questions, but assuming there is collateral order jurisdiction here, I'm having trouble seeing how the district court abused its discretion, which you agree is the correct standard, right? Yes, Your Honor. So tell me what your best argument is that the district court abused its discretion. Thank you, Your Honor. The district court in this matter abused its discretion by imposing an illogical test and requirement on the Department of Correction. But I thought you said you didn't, that you didn't have any objection to the standard that was used. The standard was correct to the extent that the district court recognized that the Department of Correction has a legitimate interest in protecting execution information. Where the district court erred, Your Honor, is by requiring the Department to produce concrete examples where very same disclosures resulted in the identification of other States' sources. The Department of Correction was unable to produce such concrete examples, partly because the Department was not on notice that would be a requirement, but also the Department of Correction Your Honor, we didn't have a hearing. It was decided on the briefing. And so the district, did you ask for a reconsideration? We did not, Your Honor. So what is the breach of confidentiality that would arise by knowing the source of the drugs? What's the, what's confidential about that? Your Honor, the source of the chemical is protected under State law, and the Department recognizes that that is not a federal evidentiary and discovery privilege, but it is a factor that the district court considered, and this court should consider in the undue burden analysis. But as a practical matter, I'm just trying to get to, what is the danger, what's the risk to confidentiality? What will happen if these drugs are disclosed? What's the dire event that will happen? The dire event is that the department will be unable to secure chemical for an execution, and that with that inability, the department will not be able to carry out the execution of Gerald Pizzuto. So counsel, you know, I look at what the district court did in a more granular way, because although I agree we need to combine all of the district court's rulings and look at the impact of all of the disclosures, but the district court took them up one at a time. I'll give you one example. The district court said, defendants' arguments are speculative and conclusory. They have not explained how their supplier could be identified if the report date is disclosed. So I agree with you that if the supplier is identified from this information, there's a real problem here, and that Idaho would have, in my mind, a good argument. But the district court looked at your argument and said they haven't explained how their supplier could be identified were the report date disclosed, and that's on ER 23. And there are similar decisions by the district court on each of the disputed discovery. But let's take this one. How did the district court abuse its discretion in saying, you haven't explained how the supplier could be identified if the report date is disclosed? Because that's one of the things at issue, right? Yes, Your Honor. The report date is a piece of information that can link back to the manufacturer of the chemical. Can link back. Yes, Your Honor. And it is that link that would then produce information from which the chemical supplier — I'm sorry, the chemical manufacturer could be identified. How would it link back, just as a practical matter? How would the report date on the certificate of analysis point someone to the provider? It would identify when the results were — when the chemicals were submitted for testing and when that testing was complete. So your theory is someone could take the date of the — the testing was complete, and through that date, what source would they go to to find out who the manufacturer was from that date? Your Honor, the department's understanding is that the FDA keeps track of when chemicals are supported. It's part of their testing analysis. And the plaintiff is aware, because the defendants have disclosed, that the manufacturer is an FDA-approved manufacturer. And so — so is your theory that they would do, like, a Freedom of Information Act request and see all of the certificates? I'm sure there wasn't only one a day. That was granted. And see which certificates were granted on that day, and then try to drill down into which one was the one that supplied the Idaho Department of Corrections the drugs, the chemicals? Yes, Your Honor. That is one of the risks that is run by that disclosure. Is that practical, though? The defendants, respectively, submit it is. It's practical because those kinds of searches are happening. And they're happening daily by death penalty — anti-death penalty advocates. So I understood from the record that you were making exactly the argument that Judge Rawlinson asked you if you were making. But what I don't understand — and maybe this was addressed and I missed it — and those requests would be — if the information wasn't provided, somebody could go to state court to challenge them, right? Yes, Your Honor. So why wouldn't these types of objections come within a disclosure exception in Idaho law that Idaho could raise or the particular agency could raise in response to those Idaho FOIA requests? They would be objected to under Idaho FOIA requests. And nobody could come to federal court except the U.S. — theoretically, I guess, the U.S. Supreme Court. Nobody could come back to the district court and say, hey, the Idaho court got it wrong, correct? But those objections would not apply to a FOIA request to the FDA, which is a federal agency. Correct. The Idaho — so an objection under the Idaho Public Records Act would not apply to a Freedom of Information Act request to FDA. But in addition, those objections do not apply in this litigation with Mr. Pizzuto. But weren't you — weren't you arguing below that the — that the problems you had with the freedom of information requests were going to be to Idaho state agencies? So that is one of the — that is one of the paths that can be utilized to obtain information and get to the source of IDOC's chemicals. So one of the things that the district court determined was that Idaho Department of Corrections' analogy to a bull's-eye on the map was not a well-taken analogy. And the Department of Corrections respectfully disagrees with that. That is exactly what happens in these cases. And it's not just plaintiff that the Department of Corrections is worried about. There are a multitude of other individuals that are peppering agencies across Idaho and across the United States with these types of requests for information. And the information is then gleaned and consolidated. It creates a mosaic of information. So the otherwise innocuous information that can be obtained from one single request then becomes much more important in the grander scheme of things. I'm sorry. No, please. Could the information be made available to the defendant subject to a protective order? Your Honor, there is a protective order in this case, and defendants are aware of that. We have the ability to mark information as attorney's eyes only. But does it cover these requests? That is the defendant's concern, Your Honor. These are requests for admission. So this is information, not documents. There's two requests for documents at issue here. But most of the disclosures that were ordered are the director, the defendant's responses to requests for admission. Meaning that it's information that will live solely in the head of counsel for Pazuto. And that's the problem with the protective order. The protective order can't protect against that information and those answers being out on paper. Well, the protective order could prohibit counsel from further disclosing the information and using it only for purposes of this litigation. Your Honor, that is true. The issue with that particular idea of protection is that in this very case, the parties ended up with a stipulation to amend the protective order. In this case, counsel was relying upon discovery in Pazuto's case, in a companion case unrelated to Pazuto. When that came to light — Are you talking about Creech? Yes, Your Honor. When that came to light, the defendants understood the issues that were raised. And we did file a notice of non-objection to a protective order being amended to allow the information that was shared to be used by counsel in Creech. The issue with the protective order, Your Honor, is that the same counsel that represent Mr. Pazuto and Mr. Creech also represent seven other death row inmates in Idaho. There are a total of four attorneys that represent nine IDOC condemned inmates. And that is the concern with the protective order. And the defendants are not alleging or accusing anyone of disclosing information that's been deemed confidential in order to remain confidential. The problem is that inadvertent — inadvertent omissions — sorry — inadvertent disclosures do happen. And those inadvertent disclosures are the problem that the defendants are trying to protect against. So, counsel, I want to get to another one of these on a — on a, again, a fairly granular basis. One of the objections was whether the drugs came, you asked veterinary source, hospital, wholesaler, retailer, or pharmacy, right? Yes, Your Honor. And a plaintiff put in a deck from Dr. Almgren, if I'm pronouncing her name correctly, that, you know, there are thousands of these things out there. This isn't going to help. That's what — that's what she said, right? Yes, Your Honor. And the district court said, you said it's going to lead to the source being identified through a process of elimination. The district court described what you said as a bare assertion that apparent identification concerns exist. The district court, as far as I can see, looked at your argument and Pizzuto's argument and said, you know, it just doesn't work. And what I'm having trouble with is seeing, given the very deferential standard of review, if we reach the merits, how the district court abused its discretion, for example, on this one. Thank you, Your Honor. With respect to this particular — I believe it involved several different of the RFAs. Yeah. 190, 191, 194. Yes, Your Honor. With respect to those RFAs, the district court erred by — by refusing to acknowledge plausible inferences that were raised and presented by the defendants. It appeared that the district court disregarded all of the defendants' plausible arguments and inferences, instead relying upon Professor — or Dr. Almgren's declaration. Her declaration recites to thousands of pharmacies that exist across the United States, but doesn't acknowledge that once you limit and create that smaller target within a region, within a state, and within a town, that that — the number of potentials become much more small. And that is what the problem is, and that's the danger that IDOC identified, that the district court disregarded by requiring that the department provide an actual roadmap for how that bullseye could be narrowed and targeted. Defendants respectfully submit that we did provide exactly how that roadmap could be narrowed and that target could be narrowed, and it was disregarded by the district court. We noted that individuals' travel itineraries could be requested, that expense reports could be requested, and that is the very data that will narrow who went where at what time. And that's the danger that's posed by the cloud, by all of these requests that are at issue in this particular case. With respect to that, the other RFAs are also an important part of that analysis, because in addition to trying to narrow down where the chemicals came from and also what type of business the supplier was, the plaintiffs already have a lot of other information. So plaintiff knows that the supplier is compliant with all state and federal licensures. The plaintiff knows that the manufacturer is FDA approved. With these additional factors, the plaintiff can take a lot further action in determining who the supplier is and who the manufacturers. And so when it comes to undue burden, the defendants asked the district court to weigh the risk to the defendants and the benefit to the plaintiff. And that weighing simply was not logical. The court made an implausible weighing analysis and determined that the risk to the department was low in comparison to the needs of the plaintiff. Your Honor, with respect to the collateral order doctrine, the defendants wanted to clarify that this is a proper case for the court to assert jurisdiction under that doctrine, specifically on the factor of unredressability. If the court does not reverse the disclosure order, assert jurisdiction and reverse the order, the defendants will have no recourse once those disclosures are made. That is why the collateral order doctrine is appropriate in this case. And unless the court has any further questions, I would like to reserve some time for rebuttal. All right, counsel. I have a question. It appears not. Judge Gould has a question. My question is . . . Oh, Judge Gould has a question. Yes, Your Honor. My question is, are the responses to requests for admission, are they filed publicly in the district court? They were filed publicly in the district court with the motions to compel, Your Honor. All right, thank you, counsel. Thank you. Counsel for the defendant? Plaintiff, I should say. Thank you, Your Honor. Thank you, Your Honor. Can I please have one question, please, Judge Gould?      What we did here, Your Honor, may it please the Court, Joan Horwitz here for Mr. Pizzuto, what we just heard was 15 minutes of speculation. What we didn't hear was a reference to a single piece of evidence in the record that substantiates IDOC's fears, a citation to a single case from any court in the country approving of the withholding of this kind of information. Are there cases that have approved the provision of this kind of information? Yes, Your Honor, there are. I would direct the Court to the Martin case from the Northern District of Georgia, which is the case that IDOC itself is relying on for its iteration of the test, but which in fact orders the Georgia Department of Corrections to provide, if anything, more specific information about execution processes. Any other court? Your Honor, I don't know offhand that I could provide one. I would say just generally if the Court looks at the decisions that IDOC is citing from the circuits, it's clear that the information at issue in those cases is the identity of the execution supplier directly. Those are cases in which a plaintiff requested that a supplier be identified explicitly, and this is a very different situation with much more generic requests for information. Let me ask you about that vis-à-vis our jurisdiction. Would you agree if hypothetically you had asked who is the supplier of these drugs and the district court had ordered Idaho to answer that question, who is the supplier of these drugs, would you agree that we would have a jurisdiction under the collateral order doctrine? I would not agree with that, Your Honor. So your view is that even if the actual order was who supplied these drugs that are going to be used, that we wouldn't have jurisdiction? Why? Your Honor, I think under Mohawk it would certainly be a closer case on the jurisdictional question, and IDOC would have a much stronger argument for invoking the collateral order doctrine. But I would still submit that under the reasoning in Mohawk you would have essentially the same theory for jurisdiction being asserted by a party, which is there is sensitive information, it's protected by law, it will be disclosed pursuant to discovery, and that is the reason why the circuit court needs to address it immediately. And that's the argument that was rejected in Mohawk. Although here it's like if we — I mean, their argument is that what we've been ordered to disclose is the equivalent of who supplied the drugs. I mean, that's a different question as to whether they're right or not. But that's their argument. So the plaintiff's view is even if it were absolutely here's who supplied the drugs, that wouldn't make it under the collateral order doctrine. Why? Which prong or prongs? Yes, Your Honor. So I think the simplest answer to Your Honor's question is it would not make it under the redressability prong because Mohawk explained that when you have a discovery dispute and you have an assertion that protected information has been erroneously ordered to be disclosed, there is a remedy for that post-final judgment. Yeah, but you can't un-ring that particular bell. That bell is rung forever, right? Absolutely, Your Honor. But that was also true in Mohawk where you have the attorney-client privilege, a very venerable privilege, and information that could be extremely sensitive that could disrupt attorney-client relationships. But that certainly didn't involve an execution drone. No, no, Your Honor. But I would suggest that it involved a more serious privilege and a privilege that the courts have respected for a longer period of time and something the courts are very consistent about safeguarding. So it was a compelling interest that the party in Mohawk had in asserting collateral order doctrine. Counsel, what's your response to opposing counsel's position that the information requested can be used to discern the identity of the provider of the chemicals? My response to that, Your Honor, is that it is incorrect and that the district court properly rejected it as being completely speculative. There is only evidence, opposing counsel just referred to inferences that might support IDOC's position, but there's no evidence in the record to support those inferences. The only evidence in the record supports the opposite inferences, and that includes the declarations from Dr. Almgren that Judge Bennett referred to in which she explained in a very direct, straightforward way how all of the requests relating to both the type of supplier and the requests relating to the type of origin of the supplier, that those could not lead anyone to narrow down in any meaningful way the source. And there is no information on the opposite side. But for you to succeed on the appeal, putting aside the jurisdiction issue, we don't have to find that there are no inferences which could support what they're saying. We would just have to find that in looking at the evidence, the district court looking at what there could or couldn't be inferences, the district court didn't abuse its discretion in siding with you, right? Certainly. Even if we might decide it differently, if the district court were just simply weighing the evidence and the reasonable inferences and deciding where that takes the district court. Absolutely, Your Honor. That is 100 percent true, and this is an area of law, as you mentioned, that in which appellate courts traditionally afford great deference to district court judgments. And this is an especially easy case in the sense that there is simply no evidence on the other side of the scales. And on that point, I just want to respond to a couple of the specific contentions that opposing counsel articulated. So one thing that she mentioned was geographical limitations. You could narrow it down to state. You could narrow it down to town, et cetera. Those aren't the discovery requests at issue. The questions that were posed about the geographical origins of these drugs were basically twofold. One, were they made in America? And two, were they made outside of America? So there's certainly no basis to vacate a well-reasoned, thoughtful district court decision here with reference to discovery requests that are not on the table. These were extremely broad, abstract discovery requests. And that is also true of the types of businesses at issue. And as you mentioned, Dr. Almgren did explain how there are tens of thousands of veterinarians. There are 60,000 pharmacies. There are many, many places that these discovery requests refer to. And IDOC has never explained how the answers to these particular questions would narrow down the source. So I apologize for not knowing the answer to the question. I should know it, but I'm going to ask. Did Idaho ever make a downward challenge to Dr. Almgren's declaration? Not formally, Your Honor. What IDOC did below is what it has done on appeal, which is to refer in passing to Rule 702 and to not elaborate on the 702 theory except to say that Dr. Almgren should not be relied on, essentially. And in both courts, it was a single sentence with no explanation, no discussion. And just to make an obvious point, IDOC could have presented its own expert. It could have pointed to evidence on the other side, which it didn't. They did not request a downward hearing? No, they did not, Your Honor. The most they have ever done as far as questioning the propriety of the district court relying on Dr. Almgren is to say that Rule 702 ought to prevent the courts from relying on that testimony. And she is a pharmacologist. She is someone who is a specialist in this field to the extent that this court wants to look beyond the fact that there is no evidence, no countervailing evidence to call into question her own conclusions. She is certainly a qualified expert. Just one more general point about secrecy that I wanted to emphasize, which is IDOC continues to talk about this information as a mosaic, as a kaleidoscope, so on and so forth. That was the district court's approach. The district court agreed with IDOC that this information had to be weighed in the aggregate. It didn't just limit each particular request to a sort of vacuum analysis. And they won on some, right? Yes. Yes, Your Honor. The district court denied a number of our motions to compel, both in the order that's on appeal and in prior orders. This is a district court that's been very judicious about weighing discovery requests and protecting IDOC's interests where it's appropriate. I also want to stress that I would encourage the court to look very closely at the record that was in front of the district court. Today, it seems to me that opposing counsel has referred to some facts that were not presented to the district court when it was adjudicating this motion to  So one thing in particular that jumped out at me was the idea of the manufacturer being FDA approved. That's not something that I don't believe was argued to the district court. The district court could not have abused its discretion for failing to recognize. I didn't remember that, but I haven't studied the record in the same way, obviously, you and your friend have. Yes, Your Honor. And I'll correct that representation if it's mistaken. But I don't believe that point was made to the district court. And I would also say I don't think it's appropriate to vacate a district court order for essentially on the basis of information that IDOC has voluntarily disclosed. In other words, if IDOC's position is that it has itself narrowed the range of sources, that was its own prerogative. But the district court can't be faulted for those decisions that IDOC made. So are you saying that the information that was thought to be disclosed had already been disclosed by the Department of Corrections? I suppose, Your Honor, the fact that I had in mind when I made that statement is the FDA approval. That's something that IDOC volunteered that they did not object to. So I would caution the court against relying on this sort of narrowing theory to the extent that it's dependent on IDOC providing the information that it is now saying it should not have provided. But if I understand your argument, and, again, I can certainly look at the record too, you don't recall an argument being made to the district court that there should be an FOIA request to the FDA. I don't recall that argument. The argument that I recall is the argument about public record requests to Idaho state agencies, yes. And there I would just underscore what I heard to be opposing counsel's statement that, in fact, the recipients of those public record requests would invoke the secrecy statute in Idaho, which would completely accommodate IDOC's concerns. That has not historically been their position. In the past, they've said the reason that we need to keep this information from disclosure is that Idaho state offices won't understand their obligations under the S.H.I.E.L.D. statute. So if they would understand it, and I don't think this Court has any reason to assume that those Idaho officeholders would have any misunderstandings about their duties, that's an additional reason to affirm the district court here. Counsel, would you have any objection to the disclosure of this information under protective order that would preclude further disclosure? I don't know that I can answer that unequivocally today, standing here. What I would say is, as opposing counsel referenced, there is a protective order in place under the process establishing that protective order. IDOC always has the ability to designate discovery responses as confidential, as attorney-eyes only. It is true that I don't know that the protective order by its terms addresses requests for admission, but IDOC could easily find some. Well, but if that were a way for us to direct the court who could affirm with the condition that there be a protective order prohibiting the attorneys from further disclosing the information, why would that be objectionable? I don't know that I can say it would be objectionable. What I would suggest is that the appropriate path in that scenario would be to let the district court resolve that in the first instance, and I think that's consistent with the protective order, which gives IDOC the ability to mark information as confidential, and if we wish to challenge that determination, we can, and the district court can resolve that. So as you sit here today, you would not be willing to say that that's a good way to resolve this issue? So what would be the incentive for you as counsel to disclose the information further? I don't think that we have any incentive. I just hesitate to make a concession, particularly when it comes to discovery responses that are, I think, so disconnected from the source. I honestly do not believe there would be any basis for IDOC to place under seal or prevent the public from knowing, for example, that it's a veterinarian that produced the drugs. I don't think IDOC has made any kind of proclamation. But if your interest is in obtaining this information for your client and not for the general public, I don't understand why there would be resistance to having it for your eyes only or to prohibit further disclosure. I'm not saying necessarily that there would be resistance. But I do think genuinely that it would be legally incorrect for IDOC to say, for example, it ought to be protected when we admit that the drug source is a veterinarian, when the only evidence in the record is that there are tens of thousands of veterinarians. I think the arguments that they would have for keeping that information from the public would likely be the same as the arguments for why that information ought to be insulated from disclosure. And in my view, those arguments are insubstantial, and the district court properly rejected them. But they certainly could make those arguments again in the context of keeping information. In this particular case, were those arguments made regarding the protective order, or was there consideration of including these within the protective order during the course of these proceedings for this particular request for admission? Not that I'm aware of, Your Honor. I don't think that conversation happened. And that is absolutely something that could happen on remand. But, again, it would be no reason to vacate the discovery order, and there would be every opportunity for the district court to adjudicate those. Although if I understood Judge Rawlinson's question, I didn't hear Judge Rawlinson saying vacate the discovery order as opposed to putting sort of a footnote on a hypothetical affirmance by making this subject to the protective order. Understood, Your Honor. And that is, in similar litigation, protective orders have been one of the main vehicles for this type of information to be transferred. Just one brief discrete point, which is in terms of the risk associated with the date on the COA, I believe opposing counsel was asked about that. I don't think that there's any argument in the briefs on that at all, so I would contend that that's been forfeited, that IDOC. Well, but if that's a question that we wanted to explore and we did explore it, what's your position on whether or not knowing the date of the certificate could lead to the identity of the supplier? I don't believe it could. I don't think there's any evidence to support that. I think as with so many of these arguments that IDOC has advanced, it is entirely conjectural. There's no citation to any expert. There's no citation to anything in the world at large. There's no discussion of how pharmacy science works or how the regulatory regime operates, and the district court was correct in looking for that kind of concrete argument and finding it lacking. Is the relevance of this date to see whether or not the chemicals being used are not expired, or what's the relevance of that date? Yes, Your Honor. So expiration is sort of a different subject matter, and we do actually know the expiration date, but our position is that it is still relevant to know when testing was performed, because you could still have concerns about the validity of a test based on how much time had elapsed. So results might become stale with time. They might not be as reliable, and so on and so forth. And while we're talking about the certificate of analysis, one other brief point I want to make, because it has really been the centerpiece of IDOC's presentation, IDOC's view is that we don't need anything beyond the certificate of analysis, and that's really not a defensible point of view to take, partly because all of this information is relevant for the reasons that we have examined, but also because the certificate of analysis itself is an extremely opaque document. We have no idea who prepared it. We have no idea what methodologies they used. We have no idea what the qualifications were of the personnel who were involved in that testing. So there's no way that it could reasonably be said that the certificate of analysis can substitute for all of the other information that we're pursuing in discovery. With my remaining time, I do want to just briefly say a couple of things about the opposing counsel suggested during her time that it is the redressability prong where IDOC's need for interlocutory jurisdiction is most apparent. And there I would just again reiterate, that is precisely the theory that was expressed in Mohawk, that when information protected from discovery is ordered to be disclosed, that there's no way of redressing that. And Mohawk said there is a way of redressing it. It is after final judgment with a traditional appeal. If there's some problem with that order, there can be a remand. Well, but the difficulty is as a practical matter, once the information is out, if it should not have been disclosed, then there's no way you can undisclose that information. And that's why I thought a protective order may be the best mechanism for precluding that eventuality. I think that's a fair consideration. But just to make the point again, that was also the case in Mohawk. The cat was out of the bag there as well, and it didn't persuade the court to. I understand. Different court. Different cat. Different cat. All right. Thank you, counsel. Thank you, Your Honor. Good afternoon. Just a couple of points on the questions in the presentation by plaintiff's counsel. With respect to collateral order doctrine, the defendants respectfully submit that there is an issue. This is not the same as Mohawk. This is a situation that is much more similar to a situation with trade secrets. So in the trade secrets context, there has been a determination that collateral order doctrine is appropriate to address an interim order of disclosure. And this situation is much more similar to a trade secret type of disclosure than an attorney-client privileged disclosure. Mohawk was very clear that the discovery order had to do with attorney-client privilege. And the reason why that was redressable was because on remand, there could be an order that the information not be used at trial. That is not the harm that the defendants are submitting here today. The harm is disclosure itself, not its use at a later date, not its use at trial. It's the disclosure itself. With respect to the other questions on the mosaic theory of disclosure, this is a situation where the department takes its obligation to carry out a death sentence very seriously. And there's a lot of weighing that is done. The director has identified that it was difficult, nigh on impossible to locate a source. In fact, the record is replete with that information. He said he could not find a source, and then he was able to locate one. So he's taking that source's identity and keeping it under cover for very good reasons. The defendants have reviewed these disclosures in a totality of circumstances and have determined that there are certain disclosures that are necessary to comport with the Eighth Amendment, to comport with the Fourteenth Amendment. But there are other disclosures that just get too close to the line. And that is the determination of the line of disclosing the source. In other words, the plaintiff needs information to litigate his claim and to ensure that he will not suffer an unconstitutional deprivation during his execution. What he does not have a right to is information that will disclose IDOC's chemical source. It's not necessary for him to know that in order to contest the Eighth Amendment claims.  But Plaintiff's counsel is saying that it's speculative that the information that's being disclosed can be used to discern the supply of the chemicals. What's your response to that? The defendants respectfully submit that it has occurred. It occurred as recently as July when John Oliver disclosed the Federal government's chemical source, and it also occurred in July when NPR disclosed Texas's execution chemical source. This has occurred. It is not speculative. We were able to cite to the John Oliver circumstance in our briefing, in preparation for the argument, I located the NPR article where they also outed a Texas source. So this is not speculative. These kinds of attacks have occurred. They will continue to occur. And the defendants respectfully submit this Court should reverse the disclosure order for that reason. All right. Thank you, counsel. Thank you, Your Honor. Thank you to both counsel. The case just argued is submitted for decision by the Court. We are adjourned.
judges: GOULD, RAWLINSON, BENNETT